The first case on the calendar is Bouchard Transportation v. Long Island Lighting Company, and we are ready to proceed. Thank you, Your Honor. Good morning, Your Honors. I'm Jim Hohenstein with Holland & Knight, and I'm here on behalf of the Long Island Lighting Company, DBA, LIPA, and may it please the Court, LIPA is the wholly owned subsidiary of the Long Island Power Authority. The Long Island Power Authority is a governmental entity created by the State of New York. The sole purpose of LIPA is to provide power to the citizens of Nassau and Suffolk counties. In other words, the sole reason for LIPA's existence is to serve the interests of its rate payers on Long Island. Now, there's another authority involved, which is the Power Authority of the State of New York, colloquially referred to as NIPA. Many, many years ago, NIPA was charged by the New York legislature to help promote the transmission of cheaper electricity from upstate to Long Island. Now, this led to the construction of what's called in this litigation the Y-49 cable, which is a large 600-megawatt transmission cable, which starts in Westchester on land and then it submerges cables through Long Island Sound and then into Nassau County. Now, at that time, LIPA's predecessor, which was Lilco, or the Long Island Lighting Company, was frankly cash poor. So the construction of this cable, which at the time in the late 1980s, early 90s was over $300 million, was funded by NIPA. And thus, very complex financial and operational arrangements were required. Essentially, all the costs of the construction, operation, maintenance, repair of this 26-mile cable from Westchester to East Garden City in Long Island was to be paid by Lilco and then by LIPA, and including various charges, et cetera. All of this is detailed in our briefs, so I'll just... The first issue that it seems to me you need to prevail on is the collateral estoppel issue, right? Before we would really be considering the merits of your position. So could you address how the district court erred in its treatment of that issue? Yes, Your Honor. I think it's LIPA's position, Your Honor, that yes, there was a litigation in 2003 over a similar anchor drag and hitting of the cable. LIPA certainly did not chose to litigate in Houston. It was a limitation of Liability Act action and was brought by the owner of the barge in Houston. In fact, NIPA and LIPA opposed the venue and sought to have a transfer to New York, but that was denied. LIPA did, in fact, assert similar economic claims. Our point is this, Your Honor, that the collateral estoppel doctrine, the cases uniformly recognized, exceptions under special circumstances, are extraordinary factors, and we would submit that those factors are present here and were not followed by the district court. In essence, the very clear precedent in the Fifth Circuit is that to have a proprietary interest. Certainly, NIPA owns the cable, so we are in the area of Robbins-Drydark exceptions, which has the proprietary interest, which involves possession or control and repairs or maintenance. There is no maintenance required of a submerged cable. However, the Fifth Circuit's precepts we submit require actual or exclusive possession and control of the property involved. Here the district the magistrate judge in Texas concluded that LIPA did not have actual or exclusive possession and control of the submerged cable. Now, Your Honor, in contrast, we would argue that there is a different rule pertaining in cases arising in the Second Circuit, and that American Petroleum, this Court's decision on Robbins-Drydark, doesn't preclude the looking at those cases, which are, admittedly, one case in the District of Connecticut, Metro-North, and one case in the Eastern District of New York in Ray-Moran. Now, those cases both — Help me understand that argument, because we explicitly affirmed in American Petroleum that we wanted to — we affirmed Robbins' setting forth a bright-line rule, and we wish to be part of the consensus around that rule. But your argument is that we have applied it differently, and for that reason collateral estoppel is not appropriate here? Well, we would — we — we submit, Your Honor, that there — that it is — one of the bases, and we have two bases for trying — for distinguishing the collateral estoppel argument, Your Honor. The first is that it is appropriate for the Court, as noted by Justice White in concurrent opinion, to look at differences in the circuit. This Court has not specifically ruled we would submit on these kind of cases where we have an elision, that is, a moving object hitting a stationary object in maritime — a maritime case, such as hitting the bridge or hitting the stationary cable. The Court has, indeed, in American Petroleum, looked at Robbins' dry dock. But what's key there, Your Honor, is take — is looking at the nature of the — of what was claimed. There was no — nothing got hit in American Petroleum. A drawbridge was stuck, you know. The tug and the barge was delayed and claimed damages. And that's — that's a classic Robbins' dry dock. And when this Court in American Petroleum recognized the Fifth Circuit, the key case there is Test Bank, which deals in Test Bank in the Fifth Circuit en banc decision, is a collision of two ships resulted in a chemical spill, and then various people claimed, you know, all, you know, seafood, repair shops, damages. We would submit this is a different case. The second — We've used a different standard from the Fifth Circuit, so is there? No. Not — not the Second Circuit itself. No, Your Honor. That is correct. What we are arguing for is that this is a — this would be a new issue for the Court to look at, because even in American Petroleum, the Court recognized — this Court recognized there are exceptions to the bright-line application of Robbins' dry dock, or we would argue them. I would like to briefly address, Your Honor, my — my time, our second reason. And we think one of the other legitimate reasons to accept the application of collateral estoppel is public policy. We're not arguing that a public utility such as LIPA is entitled to some kind of separate pass, but we would argue that it is legitimate for this Court in the Second Circuit to consider the effect on LIPA and its ratepayers by — by applying the doctrine of collateral estoppel in this case. Thank you, Your Honor. And I have a few minutes in rebuttal, so we can return if the Court has any other questions. Thank you. I'm going to put down a little tiny bit, just a little bit. Good morning, Your Honors. May it please the Court. I am Gina Venezia, and I am here for Bouchard Transportation. At the outset, I think it's important to note that LIPA was actually not prevented from litigating any issue. I say that because in the context of this case, it is a maritime case. It was to be tried and always will be tried by Judge Crotty sitting without a jury. The case was pending before Judge Crotty for a number of years. There was extensive discovery, copious documentation, number of witnesses. The point is the factual record was well developed. It was also uncontested. LIPA does not stand before this Court and did not stand before the district court arguing that there were any issues of fact which precluded summary judgment. The facts were uncontested. The facts demonstrate without question LIPA does not own the cable that was damaged. LIPA does not maintain the cable that was damaged. LIPA had no repair responsibility with respect to the cable. NIPA responded to the spill. NIPA was responsible under environmental laws to respond to the spill. NIPA coordinated and paid for all the repairs. And LIPA still, as of today, six years after, has not paid for those repairs. It may, under the agreements with NIPA, at some point in the future, have to reimburse NIPA at some amount of money that is left to NIPA's discretion. That, I submit to you, is not a responsibility for repair or maintenance as required by Robbins. LIPA's position is instead one that focuses on the applicable law. And I think Your Honors have keyed into that. The district court did determine that LIPA was collaterally estopped from relitigating that it lacks a proprietary interest in the cable. But the district court also had an alternative finding that, in any event, LIPA had not demonstrated that it had the necessary proprietary interest as required by Robbins. The district court had before it the well-developed record and recognized the key facts in that regard. So, in examining the collateral estoppel, it is important to look at what is the law. That's really what we, we hear that just now. They're arguing that the law is different in the Second Circuit. I submit to you, it is not. American Patrol- If it was, would that make a difference? I don't think it would make a difference, ultimately. Because, again, first, I don't, I don't accept that at all. But, you know, there are cases which say that the law is different in a different circuit. That does not necessarily require the lack of an application of collateral estoppel. But I think it is important to focus on the law. And I want to, if I can, direct back to that point, Your Honor. In American Petroleum, now, you can search through legions and legions of maritime cases. You don't apply a different standard of maritime law, depending on the type of maritime incident that is at play. Robbins Dry Dock has been applied uniformly and consistently throughout maritime courts in cases of all sorts. Cases involving elisions, cases involving collisions, cases involving cable strikes. You name it, Robbins Dry Dock applies. This court had occasion in American Petroleum to examine Robbins Dry Dock in a case that was a little different. It involved the, you know, failure to open a bridge. And what does that mean? But I think what's important is this court took that as an occasion to re-examine Robbins. This court stated and reaffirmed that Robbins Dry Dock is a bright line rule. There can be no dispute under maritime law, you must have a proprietary interest in property that is physically damaged before you can recover in tort for economic damages. American Petroleum didn't really speak to the test and whether we follow the, you know, the Fifth Circuit's approach in terms of the, I guess the first prong is the most important one, the actual possession. That is correct. So the American Petroleum Court did not have before it the precise question of what test do you apply to determine whether the bright line rule of Robbins is satisfied. But I think, nonetheless, American Petroleum informs the guidance of what the test should be. Because if you look at American Petroleum, two of the main reasons why this court reaffirmed Robbins as being a bright line rule is because the court said it promotes certainty, number one, and it promotes the consistency and uniformity that's required by maritime law. So I submit to you, then, if the issue before the court is what test should be applied to determine whether the bright line rule applies, it is the test or should be the test that has been applied by courts throughout this country. In many, many district courts, not just in the Fifth Circuit, Eleventh Circuit, Sixth Circuit, Fourth Circuit, it is a three-factor test that looks at the facts. I submit to you, you need a bright line test to determine if the bright line rule is satisfied. This Court in G and GNG Steele cited the three-factor test as being the appropriate test for determining if Robbins' proprietary interest is satisfied. G and G was a procurium opinion. I don't cite it to you for the proposition that it's binding on another panel, but I cite it to you for the proposition that the court, this court, even recognized that that is the test that's applied consistently throughout the country. It is the appropriate test. Now, counsel refers to two district court cases that they suggest indicates that the test in this circuit is different. Those facts, the facts of those cases are markedly different. And if you examine those cases closely, you will see that ultimately, really what the courts were looking at was did the claimant have the ownership or possession or responsibility for repair or maintenance, which are the factors that are looked at in Robbins' dry dock. In the Moran case, a cable strike case, that cable was jointly owned. The submarine cable was jointly owned by the two claimants. So the Court first suggested that as co-owners, you don't even have to get into the Robbins analysis. But the case, LIPA does have ownership of the physical non-submerge or part of the physical non-submerge parts of this cable system. Well, I would suggest to you that in their claim, if you look at their claim in NIPA's excuse me, NIPA, LIPA, LIPA's claim, if you look at Joint Appendix 69, for instance, they describe the cable system that was damaged in this case as consisting only of the four submarine cables. That is the piece of equipment that was damaged. The testimony is uncontested. LIPA's own witnesses, Joint Appendix 188, admitted that the only property that was damaged was the submarine cable. These are a multitude of assets I would submit to you and agree with you throughout the entire system. But what was damaged here was an isolated piece of equipment. It was the underwater cable. They allege that that was damaged. They focused the district court on that piece. And that is what is before the Court, not some broader-based system that extends throughout the State of New York. I understood their argument about Moran to be in part that we should, that the proper way to look at this is to the cable system as a whole rather than its component parts, the submerged cable and the overseas part, or the not underwater parts that are on each end of the cable system. Well, I don't know if that may be their point, Your Honor, but in the Moran case, it was the cable itself was co-owned, not multiple pieces. In addition to that, in the Moran case, the two, Lilco and Connecticut Power and Light, they co-owned the cable. They both maintained property insurance on the cable. And Connecticut Power and Light actually paid $11 million in the repair damages, markedly different from what we have here. So I don't know if that is the proposition that they're suggesting to you, but I think it's important to note that even in Moran, they weren't talking about a system. The very cable was co-owned by the two parties. The Metro North case, which is the other district court case that they have relied upon, involved a walk bridge, and that was, there was a lesion. And what the court said there, the court, the district court denied summary judgment commenting that Metro North's proprietary interest argument was a weak one, but still they would allow that to go to trial, a jury trial, jury trial. There was a jury trial in that case. But what was important, what the court noted in that case, and I think this is important, they said Metro North, we're going to assume Metro North is the only entity on site 24-7. It is in the best position to discover any damage, to assess any damage, and to take the steps to repair any damage. So although it was not stated, I would submit to you that essentially what the court was looking at is, did they in fact have a repair obligation, an actual repair obligation? Not a monetary, perhaps at some point in the future, reimbursement obligation, but an actual obligation with respect to the physical damage to the bridge. Markedly different. You know, my time is almost up, and I just want to, you know, reiterate. Robbins Dry Dock has been around for a long time. I would say it's as old as Methuselah, just to emphasize the point, but that Methuselah is much older. It is a bright line rule. In Robbins Dry Dock, it involved a time charterer who is a long term lessee of a vessel. If a time charterer, in that instance, does not have a proprietary interest, someone like WIPA, who is just entitled to a portion of the power generator transmission by a cable, certainly doesn't have any interest. The rule is bright line for a reason. Maritime law needs certainty, it needs uniformity. In order to foster that, you need a factor test that looks at the facts, one that is applied uniformly around the courts, and one that provides certainty. Not an amorphous test that looks at other concepts. Thank you. Thank you, Your Honor. Maritime law also allows for fairness and justice, and I would say that's what we are seeking here. Your Honor, as far as the Moran case, there's one thing. The cable was co-owned in that case, it ran between Connecticut and Long Island. But there's a key fact that counsel did not emphasize. It wasn't a completely co-owned thing. Because of various regulations, CLMP, Connecticut Line of Power, owned the cable to the Connecticut border. Lilco owned the cable on the New York side. So it was a joint-owned cable, but it wasn't an undivided interest. What's important in the Moran case was the casualty, the anchor drag, such as here, occurred in the New York side. So in other words, CLMP's property, which it owned, was not damaged. It was Lilco's property. Moreover, however, but under their agreement, very similar to here, there was that CLMP and Lilco was responsible for conducting the repairs wherever on the cable, on whatever side. But then, of course, CLMP had to reimburse Lilco for the repair costs. Again, that's very analogous to what we have here. Moreover, as Judge Livingston noted- Can I ask a question about, if we were to rule for you, we would have to articulate a new test that is different from our own precedent and create a circuit split with the Fifth Circuit on the exact same issue. Why should we do that? Because this is an important issue, because this is an elision case, where, when the court has the opportunity to examine the record, this isn't a case like the tug and the barge that happens along with the drawbridge. This is a relationship between NIPA and LIPA for the operation of that cable that's gone on 30 years, costs millions of dollars a month that LIPA pays NIPA, and plus the fact that LIPA has, in fact, serious operational control of that cable. You know, it's done by way of phase angle regulators, which are in the East Garden City. Only LIPA has operational control of the cable, so there is that custody and use. Also, LIPA has responsibility on the land-based side on Long Island for the repairs to the cable. So if there's any kind of casualty there, LIPA has to repair it, in fact, pay for it. NIPA doesn't reimburse them, even though technically they have title to the cable. So for all these reasons, LIPA stands in a very different position, very different position than the tug and the barge that came along and was prevented from using the bridge. And I would say that the case is serious enough that this court, the Second Circuit, could use this case to examine in detail the proprietary interest in the context of a maritime elision. My time is up, and I thank Your Honors for your attention. Thank you both, and we'll take the matter under advisement. Second time we're seeing you, Ms. Vincenzia. Busy week.